Thank you, Your Honor. May it please the Court, I'm William Davis from Davison Company, Los Angeles, appearing for Affordable Housing Development Corporation, and Ashwood Construction, referred to in the briefs collectively as AHDC. We point to two series of errors, really, that stem from several misconceptions on the part of the District Court. As regards to the current result in the case, which is the loss of 324 units of low and very low income housing rent-restricted for 55 years, and the loss of AHDC's entire investment as well. The errors we point to, the first is related to the trial judge's determination, post-judgment, that although we prevailed on obscure impact theory, that that simply wasn't enough, that we had to show intent, or prove intent rather, not make a showing of intent, but actually prove intent outright. And then also the district's ---- I'm going to cut you off at that just point, because the city makes the argument every time a city comes to a negative decision on these bonds, there will be an adverse impact on some minority. So it robs that whole process of any meaning. How do you respond to that? Yeah, that's simply untrue. First of all, the TEFRA procedure involves not only low income housing, but it involves marinas, construction of pollution, water facilities, things like that, harbors, marinas. So it's a generic kind of an authorization to do a local review. Our response to that is that there may be instances in which the city, there may be an effect from the location of a low income housing development, particularly very low income housing. However, the city is constrained by state law to follow state law. And in the instance of state law, under 65589.5 of the California Government Code, the instances in which a city may turn down a low income development are enumerated, none of which were applicable here. Well, you're saying it might apply in some others. But as far as bonds for housing, you'd say they automatically have to do it or they'll be liable. No, that's not what I'm saying. What I'm saying is that the legislature in California has spoken to the instances in which low income housing may be turned down. And there is, in fact, actually a catchall under that provision I just mentioned. California law doesn't apply to the TEFRA program. I believe it does, Your Honor. Where? How? It has to do with a different kind of housing project, doesn't it? No. I don't understand that argument. Preemption under TEFRA is only to grant approvals. In other words, if there were a state or local ordinance that prohibited a city from having the power to grant a TEFRA, that would be preempted. But in the instance of a disapproval, they're required to comply with state law. How? Where do you get that? That's what TEFRA says, actually. Where? It's actually cited in the briefs. I know. And I don't see you – I mean, I understand you made that argument, and I followed it out and don't get it. So what's the basis for it? I mean, Your Honor disputes that the preemption is only for approvals? No. What I dispute is that California – this California statute that you point to as having a bearing on it has anything to do with TEFRA approvals of this sort. No. It has to do with the approvals or disapprovals of low-income housing. Sure. The question then would become why would the city be able to evade state law when reviewing Okay. Go ahead. Will you just tell us, if it's in your brief, look at it and tell us where the citation is to the statute. I will try and do that, Your Honor. Federal statute is, I assume, what you're asking. Federal statute, yes. I'm trying to find the TEFRA argument here. You didn't give it much attention. We do cite the discussion on page 43 of our brief, opening brief. I'm trying to find the specific one. It's also in the city's brief as well, but there is a provision of TEFRA that limits the application of TEFRA only to – preemption only to. Would you find it, please? Certainly. I believe I have it. I believe it's 26 U.S.C. 141 E1A, 142 A7, and 26 U.S.C. 147 F. And the regulation, I think, that's most specific to Your Honor's inquiry is 26 CFR 5F.103-2D. I'm sorry. I was reading the CFR site. No, but would you go back to the statute to start with? You said it was in the statute, and you got it to F. Now, where is it in F? Well, it should be clear that the – No. Where is it in F? Please answer that question. Okay. I don't think it is in F, Your Honor. It's not in the statute, then. No. It's in the CFR. All right. It's in the CFR, which has the full statute. Yeah. Well, we've got those somewhere here, too, but do you want to give us the specific site in the regs? Yes. It's 26 CFR Section 5F.103-2D and 26 CFR Section 5F.103-2F2. I guess I just don't understand, no matter what Teffer says, how the California Government Code section has anything to do with the denial of a bond financing. It has to do with perhaps denial of a project on the ground that it doesn't comply with zoning or whatever. But we weren't there yet. The financing got yanked. So I don't get what the California statute has to do with this, wholly apart from preemption. The California Supreme Court, I believe, has spoken in a couple of instances that the planning and zoning provisions of state law do apply any time they're considering a definite actual development. In other words, a development has been identified. And that is really our facts here. So the question would become, following Your Honor's line of logic, is what would – is that you would actually have Congress essentially carving out, I assume, a way for – a way for the California statute to say that the approval may satisfy the requirements of this section without regard to the authority under state or local law for the acts constituting such approval. So that's what the regulation says. But even if it didn't say that and you go to the California statute, why does it trigger? I mean, to me, you're way off on a tangent. But if you think it's an important tangent, I want to try to understand it. Well, I think it's a critical one, because if the Court were to rule the other way, then essentially a new way to violate the Fair Housing Act would have been created. Because if cities are free of all regulations, anything that constrains them, they become, in effect, sort of kingdoms and duchies at that point. The city's position is, is that state law is preempted. The city's position also is that the Fair Housing Act is preempted. We're no longer – you're no longer making a disparate impact argument, if I understand you, right? You're making some kind of argument that this violates California law? What happened? How it went down? Because it didn't make written findings or something? What I'm saying is that 65589.5, I believe, would have applied in this proceeding because there was not an approval granted. To what effect? I mean, so it – All right. It limited the discretion that the city had to turn the development down. And it set forth the reasons. That would just simply be some kind of an abuse of discretion for not having made some findings that it was supposed to, wouldn't it? Well, it bears on the – I just don't get – I mean, I guess I'm just having major problems understanding the focus of the argument. It bears upon the pretext analysis. Because after we have shown the prima facie case in terms of impact, apart from the direct evidence of intent that we had in this case of anti-families with children and so forth, then the burden shifting analysis would come forward and the city would say, no, no, we didn't discriminate based on race or ethnicity or familial status. Our reason for doing it was – Yeah, and they gave 19 reasons. Whatever it is. They gave 19 reasons. So we know what their reasons were. Correct. So? But the question is, why can they use reasons that they would not be able to use under state law in any other proceeding? Where does state law say they can't use the reasons that they used? The reasons are set out in 65-589.5. And, for instance, the city argued need. I'll just use that as an example. Didn't need the development. That's what they argued. The problem is, is if you look at 65-589.5, need is preempted. In other words, the only time they can argue need is when they've met their regional housing needs assessment numbers or targets for having developed low-income housing. They did not have that done as acknowledged in this case. They simply didn't do it. So why do they get to go into a Federal court and argue completely contrary to what the State of California said they may do? Well, because we're looking at a Federal statute. I'm sorry, Mr. Davis, to ask you to go back, but I now have located my copy of the regulations, and I didn't get you. What was your cite to the regulations? Judge Reimer just read it, the actual text. The regulations? This is the Federal regulations. I just read it, and it's. Well, what is it? I have to find it again. Just a second. I think it's 5F103, 2F2. Don't go too rapidly, because I've got to trace this down. It's 147F, is that right? Yes. 2F2. Well, wait until I get to F. It's a long ways to go for the regs. So, I'm going to go back to F, then a 2, and then what? 26 CFR 5F103, 2F2. 2F2, public approval requirement. And where does it say the State model applies? It's either that one or 2D. I'm sorry, I had a 50% chance of getting it right. What's that? I think it's 2D, 103-2D. D, all right. Let's go back to D. D, acquisition of existing property not permitted. That's what the heading says in my copy. That doesn't sound like it. It doesn't sound like it. Well, I thought you had earlier, I thought you had found this regulation. Well, I thought so, too, and Judge Reinbert just read from it, so I assume that An approval may satisfy the requirements of this section without regard to the authority under State or local law for the acts constituting such approval. Yes. That's the provision I'm talking about. Without regard to the State authority, that doesn't seem to say that the Federal standard is the State standard. Well, what it says is for approval, there's a Federal standard. And since it doesn't say for disapproval, the implication on the cases would be that there is no preemption for disapproval. So you're saying now the regulation does not say there is no preemption for disapproval? Well, I'm saying it's silent on that topic, so the implication legally would be that that's not. To apply a normal precedent about preemption. Right. Yes. And it's not impossible for the City to have complied with State law and Federal law, so I do not see the preemption issue here. But we have the problem of reconciling a Federal statute that vests power in the City Council to approve or not approve these bonds. You take a position that says when it's a housing bond, they must approve it, otherwise they'll be liable for large damages. With due respect, that's not our position. Our position is that in California, where the legislature has limited cities' powers as regards low-income developments, they must comply with those statutes  So it's automatic in California? No, it's not automatic, because you can still posit facts whereby you could comply with 65-589.5 and comply with TEFRA, and there would be no conflict. If you turned it down? Yeah. Yes. What would that situation be? Well, for instance, there's a catch-all provision under 65-589.5 that says if the regulation, which was in effect at the time the project came before, in other words, applied to all projects, they could use that as a reason. Hasn't the Federal government in this statute, I don't know if they still use this language in preemption, but hasn't it sort of occupied the field of when bonds have to be approved? They have authorized bonds. They've occupied the field to the extent that their purpose is exactly consonant with state purpose, which is to facilitate the financing and development of low-income housing. I feel like I'm in Alice in Wonderland territory. What are we talking about? What we're talking about is what the city's freedom of movement was, what reasons it could use to turn down the development after the statute. And that's a violation of the FHA, because there's no claim that it violated the California State Government Code section that you're talking about. No, we're not. Our argument is not that the you mean that the TEPRA provision itself violated Fair Housing Act? I'm confused. No. But the lawsuit has to do, I thought, with something other than a claimed violation of the Government Code section that you're talking about. That's correct. Okay. So what are we talking about? That would only have an impact in the pretext analysis in the impact case. In terms of intent, showing of intent, we already have that. Can I postulate something to you to try to cut through something at least that's bothering me, maybe not bothering you? It seems to me that your theory mainly turns on the disparate impact having, in effect, strict liability. There's no dispute that intent is not required as part of a disparate impact prima facie case in this circuit. I mean, I think that's pretty clear. And it wasn't required in the jury instructions. Okay? Everybody, to my knowledge, recognizes some kind of defense to disparate impact. In the corporate world, it's a business necessity defense. Other circuits have called it somewhat by somewhat different names when we're talking about a municipality, like a legitimate government interest or legitimate reasons related to the TEFRA Act or the loan that's being done or whatever. But they've all recognized the legitimate reason defense. Here, the jury was instructed without objection on a legitimate bona fide government reason defense. The jury's special verdict found that there was a legitimate nondiscriminatory reason for the decision to deny financing. My proposition is that ends it. That's the impact analysis. That's your honor's view? Yes. Yeah. The problem with that is twofold. First of all, there was no objection on disparate impact.  There was no objection on disparate impact. That objection, that instruction was, in fact, objected to. You tell me where. I'd be happy to. It was with respect to disparate treatment, but there was no objection on disparate impact, nor was an objection lodged with respect to it when the issue resurfaced after trial. No. We objected to the discriminatory treatment and defense of same decision in Excerpts tab 1157. I'm not talking about disparate treatment. I just got through saying you, in fact, objected to the legitimate government defense instruction with respect to disparate treatment. You didn't make any objection to that instruction, so far as I can find, having to do with disparate impact. I think we're talking about the same decision. In fact, I think you even proposed an instruction recognizing the defense. We did. Disparate impact. We did propose a prima facie case analysis type instruction. I believe that's right. I'm beyond prima facie test. I'm to the defense. I'm assuming you made out a prima facie case of disparate impact. Right. Then the government gets its turn to say it was a legitimate reason. Right. Okay? So they did, and the jury found that there was a legitimate reason. But I think the decision on that, the defense of legitimate nondiscriminatory reasons, if that's what Your Honor is talking about, instruction 17, we did, in fact, object to that. In fact, we asked for a direct evidence instruction. Direct evidence has nothing to do with the issue. The jury found that there was a discriminatory impact, right? Yes. Yes, they did. They also found that there was a legitimate reason for denying the financing. They, I believe, did find for the city on instruction 17, which is defense of legitimate nondiscriminatory reasons, I think is the instruction you're talking about. Yes. But we did, in fact, object to that instruction. You can point it out to me later where you made the objection with respect to disparate impact. But whether you did or didn't, okay, you don't dispute that there is such an animal. Yes, clearly. Oh, you do? No. No, I'm sorry. Maybe I misunderstood you. We do not dispute that the city then at that point gets to argue that, yes, that they had nondiscriminatory reasons, yes. Okay. That's true. All right. So that was found. Well, the instruction was not found, but that principle that Your Honor just elucidated certainly is. It was the jury found that there was no discriminatory reason, right? They found that, but the instruction by its own terms only applied if they found that there was also intent which violated the Fair Housing Act. That's the way that instruction is worded. No intent. The instruction says that there is no intent requirement for disparate impact, and there isn't. No, that's right. It does say that. What I'm saying is that the defense of legitimate nondiscriminatory reasons, by its own terms, that instruction is worded where it says that it only applies if you find that the city has violated the Fair Housing Act intentionally as to the following protected categories. And then it goes on and says if they had these other reasons. Does it say intentionally? I believe it does. I believe it does. So our point is that they found that. That's more in the city's favor than yours. I'm not sure why. Because if they found intent, that was the district judge's whole rationale, one of the main rationales. I guess we just read it differently. But all right. I think you've answered my question, I guess. I do want to point out, Your Honor, since we've been talking about the discriminatory impact issue only, that there was very substantial evidence of intent as to discrimination against families with children or admissions that the city wanted to keep the development out. Because there were going to be so many children living there, they try and justify that by mentioning school facilities. Once again, I point out that that's a business that the city is out of, unless Your Honors decide to put them in that business in terms of TEFRA alone. But they're certainly out of that business in terms of what the California Supreme Court has said about that issue. And then also the city did identify that it has a policy of requiring all the low-income housing to be in one section of town. And that also has serious implications in some of those, not only in terms of effect or impact, but there's also some case law that says where that impact is so dramatic constitutes evidence of intent. And in one of those --- You have a jury finding that it did not purposely discriminate. So are you saying we should throw that out? Good point. Yes. Purposefully is not the standard. And that was repeated. Very intentional and purposeful. Well, you can intend the act. That's all that you need. But you could be acting in order to help minorities, or the city could have sincerely thought the children would be better off had that development not been built. But that does not mean they did not violate the act, any more than if a female is denied a job as a pilot because they genuinely believe, the airline genuinely believes she's not up to the rigors of being a pilot. That still violates federal laws. I understand the same principle we're obtaining here. Which federal act? Are you now talking about the Fair Housing Act? Oh, yes. Yes. Yeah. I've been trying to stay on the Fair Housing Act all the way through. I'm trying to explain what I believe was the interplay in terms of state statutes and what the city's range of movement was on explaining what its legitimate reasons were, i.e., does the city get to come in at a TEFR hearing, ignore state law that's been constrained as to what those reasons might be, and offer reasons that they could offer in no other proceeding pertaining. TEFR doesn't seem to say they have to follow state law. No, I'm not saying. I don't understand it. The Fair Housing Act, I don't think, does say that. But I think the logical implication is that in the situation where you're talking about a hearing where there is no preemption for disapproval, and by implication, Congress wanted, therefore, or Treasury wanted, therefore, to have the city comply with all state laws. So you think that in a disapproval that they would have to comply with those, that's all? The Federal Housing Act and TEFRA would be interpreted differently in different states depending on what the state laws are. Yes. In other words, if there was no 65-5895 in the state of Nevada, for instance, or any Would you just tell me again how you see that fitting into the framework? Okay. Yeah. If it's only in the situation where the plaintiff has made the initial showing, the burden shifts back to the defendant, the defendant's got to come forward with nondiscriminatory reasons. And the only question before the Court is here. For disparate treatment or disparate impact? Impact. An impact analysis. Don't shift back. Or treatment, actually. I'm sorry. I'm not shifting back. The only question is, is it legitimate reason? The only shift back in our circuit is, are there reasonable alternatives? Well, in an impact analysis, after the plaintiff makes the initial showing, doesn't the burden then shift to the defendant to come forward with nondiscriminatory reasons? That's all I'm saying. Yes. In that situation, that's when 65-589 and those other statutes would have an impact, in my opinion, because I don't see any exemption for the city to not comply with those, and they may easily comply with those. So your position is it's a matter of law, not a fact. As a matter of law, their reasons didn't comply with the California statute. So, therefore, there is no defense. Is that, if I got that right? There's no defense except those that were provided under State law, yes. That's right. In a disapproval situation in California. But it might be entirely different in other States. They may not have preempted low-income housing. Okay. Your qualifier loses me again. Are you saying somehow, as a matter of law, and I guess the question is, did you make this pitch to the district court, as a matter of law, the city couldn't advance the reasons that it advanced because those reasons did not comply with California State law? Yes. I think that's right. Okay. And so you're saying that the whole thing goes down because of that. Well, that and the admissions of intent, of course, as well. But in terms of the impact analysis, I think that's right. All right. Thanks. I see I have about three minutes left, so I better save some for rebuttal. Okay. Good morning. May it please the Court. My name is Doug Sloan, representing the City of Fresno and the former council members who were dismissed from the case. Our plan is that I will take 15 minutes of our side's 30 minutes, and the remaining three council will each take five minutes. With respect to the issue of strict liability, I think the plaintiff is arguing strict liability here. They're saying that the city had no choice but to grant these bonds, which were authorized by the federal government, and that if they don't grant the bonds and if in any city the poor are disproportionately minorities, there's automatically going to be liability. That could not have been what Congress intended. When Congress said, look, cities, through TEFRA, cities, we think that you know the local conditions better, so we want you to make these decisions, because we've had a problem with how these federal bonds are being used. And at the federal level, we're having a difficulty. We think they're being abused. So we think you know the local conditions better, so we want you to make this decision for us. So they delegated federal power to the local authorities. And our position is that they did specifically preempt state law through the CFR that the court mentioned. And if that's the case, then state law that says whether the city can or cannot grant the bonds is irrelevant. And if you follow through the line of reasoning that plaintiffs are pursuing here, it would only make sense that there must be preemption, because there's a limited amount of federal money in this bond program that can be distributed. If the plaintiffs are saying, well, in the state of California, every single bond request must be approved, that doesn't work because not everybody, there won't be enough money for everybody to go around. So when you get to the one where the city, where they're out of money and they deny the bonds, then they're automatically liable for impact. So looking at congressional intent, it appears that Congress is simply delegating its power to the city. And when it does that, it could not have intended that the strict liability for doing what Congress said that you're supposed to be doing is making an up or down vote on approval of the bonds. And I think it's important for this court to make that clear in this case, because what we have are developers going around the cities and telling them, you don't have a choice here, that you have to grant these bonds, and if you don't, we are going to sue you. And by the way, we're not only going to sue the city, we're going to sue all of the legislators, and we're going to sue all of the people that speak out against the project too, which is what they did here. And that dovetails with First Amendment. In this case, we've got not only the plaintiff arguing strict liability for denying bonds where the federal government says that you have a choice, but they have chosen to sue individuals who spoke out, and this court has expressly said that you can't do that in the White and Manistee and other cases. They have sued legislators for doing exactly what they were supposed to be doing. This is not a case where there's any evidence of retaliation, as there are in several of the cases that the circuit has decided with respect to fair housing and First Amendment. In this case, the plaintiffs are saying there is liability purely because you spoke up, and purely because of a vote up or down on the bonds. They haven't alleged any other activity other than First Amendment-protected activity. In Manistee, the court specifically said that Norah Pennington immunity applies not only to citizens, but it applies to officials and entities as well, and in that case, a city. And in this case, it would be a city, so the city would have Norah Pennington immunity. As far as impact is concerned, again, we would respectfully disagree with what the court said with respect to whether or not there must be some additional showing of intent in an impact case, specifically where, as in this case that U.S. Congress has said, you have to make the decision. The reason is all of the prior cases the circuit has decided were back to Keith v. Volpe, where the court said we really don't know which way to go on this, but in this case we have lots of evidence of intent anyway, so we don't really need to decide it. These circuits are in disagreement right now as to whether there should be any additional showing when there's an impact showing here, as in here. But you're talking about to make out a prima facie case, or are you talking about for purposes of some kind of defense? To make out a prima facie case. That there should be an element of intent thrown in. Yes. Otherwise, yes. How do we get around what we've said in Paffer, whatever, however you pronounce it, and Gamble? Yes. Well, the court has said, first of all, those weren't Federal mandate cases. And second of all, the court has said, well, a plaintiff can make a showing of impact without additional showing of intent. And it appears to me that the court has never said this is the only way to do this. And this is the first time that, as far as I can tell, the court has taken up an impact case where there is this Federal mandate. And in referencing the Odekaga case out of South Dakota that was affirmed by the Eighth Circuit, the court there, and I think this is a persuasive decision because it discusses the illogic of saying, you know, Federal court or Federal government, you have said, local government, you have to make this decision. And then allowing a fair housing impact claim simply because you do what, you've used the discretion that the Federal government gave you. Without some additional showing, it just doesn't make sense. And the court in that case said that it appears that the local authority is not the one which caused the impact. It's the statute itself which causes the impact. In this case, TEFRA. In other words, TEFRA says you have to decide. And Congress could not have intended that. If you decide wrong, you automatically get sued. Well, the Eighth Circuit recognized a defense. Yes. The legitimate reasons defense. Yeah? Yes. And in this case. I'm going to argue for something somewhat broader than that. Yes, Your Honor. I think. And where does, where do you find, you know, authority for that? And why do you need something more than that to win this case? Well, I don't think we need more than that to win this case. I think that in this case we did ultimately prove legitimate justification defense that on its face, I have it here, does apply to both intentional discrimination and impact. But if the court were to decide that, well, we've got a federal mandate case where the government, the federal government says you have to decide this. You need some additional showing. You have to plead something more than purely impact. And at the summary judgment level, you'd have to produce evidence of something more than just impact because it wouldn't, it would frustrate congressional intent to allow lawsuits to go against cities when they're doing exactly what the Congress not only allowed them to do, but required them to do. In other words, these decisions are dumped in the city's laps and they have to spend millions of dollars defending these things when Congress has said you've got to do it. So it would frustrate congressional intent to say that you can win millions of dollars in an impact case purely because there is this almost intuitive impact upon racial minorities who are disproportionately poor and affected by the denial of low-income housing. So it just wouldn't make sense. And the district court in Oticaga did a good job of explaining that. Yeah, the district court did, but the eighth circuit didn't pick up on that theory. Right. The eighth circuit didn't repeat what the district court, it affirmed it, but it didn't repeat all of that language. And regardless, I think it's persuasive. And I think it would be a good idea for this court to decide the same thing, to make it clear that in these types of cases, and it may be a relatively few number of cases where FHA comes up in context of a TEFR application, but in those cases you at least need some additional showing. And in this case there wasn't because the jury decided every way possible that there was no intent to discriminate. And even at the summary judgment level, we're saying there wasn't evidence of intent to discriminate, at least admissible evidence. Checking my time here because I don't want to run over on the other lawyers. So we are saying that even though we think we should prevail both at the summary judgment level, which the court first granted and then reconsidered, and at the trial level, we did prove that there were legitimate reasons. The jury believed that. I don't think there were even disputed facts with respect to that. So we do win on that ground. But I think as far as good precedent to limit the number of additional lawsuits against cities on this very same issue, it would be a good idea for the court to make it clear, and this is a good opportunity to do that, that you need to show something additional when there's a decision pursuant to a Federal mandate. And if that's the case, then the court should have dismissed the case at summary judgment. And the trial issues don't matter. We don't even get to the trial. With respect to the proof that the plaintiffs have discussed with respect to intentional discrimination, it is appears clear to us that even the evidence that they used or attempted to use to show intentional discrimination, first was not admissible. These were the anonymous comments out of the audience. And then there is no evidence that the defendants in the case either adopted, ratified, or even encouraged those types of statements. And then, even if they did, they are immune from those comments pursuant to White and Manistee and the First Amendment. And then the same applies to Mr. Matisse, the council member who was the target defendant. And then there is no way the city can be liable because not only is there immunity for the comments in the chain of anonymous individuals, Matisse and then the city, because even if Matisse had intent to discriminate, he's only one of five council members who voted to deny the bonds. So my point is that the verdict by the jury should be upheld, regardless of any claimed instructional error, because it would be harmless error. I'm speaking to the standard of how many council members should be required in the instruction for the jury to find had intent to discriminate for the plaintiffs to prove their case. In this case, we're saying it doesn't matter because the jury specifically found that even the target didn't have any intent. And the city can only be bound by a majority of the council members. So, therefore, it's impossible that the city can be responsible for intentional discrimination, and, therefore, the verdict should remain intact. Your Honor, Your Honors, we believe that it's most appropriate here for the Court to revisit the summary judgment and vacate the reconsidered denial of summary judgment in order that the first time that the Court granted summary judgment in full be reinstated. We believe that based upon Dwight and Manistee, that there were no disputes of fact such that the plaintiff could prevail at trial on those issues, especially if the Court decides the issue of whether there needs to be any additional showing of intent with respect to an impact case. Thank you. Thank you. My name is Nancy Jenner. I represent former council member Christopher Matisse. I would like to direct the Court's attention to Jury Instruction No. 18. And Jury Instruction No. 18 sums up all of Mr. Matisse's activity relating to the Wellington Project. All of his activity was legislative in nature, entitling Mr. Matisse to immunity under Bogan v. Scott Harris, City of Cuyahoga Falls, Manistee, and White. Jury Instruction No. 18 states legislative functions include, but are not limited to, the making of law and policy regarding municipal affairs, adopting rules for future governance, making decisions about how to raise, spend, allocate public monies and government benefits, engaging in debate on public issues, such as expressing views about a matter before the city council for decision, gathering and receiving information about such a matter, seeking support for or against an issue. So I guess the heart of it is whether, you know, San Pedro or the Hawaiian case is closer. I don't believe so, because there's nothing in the record to support any activity that is outside of a protected area. Well, yeah, but I mean, if you were to say that the Hawaiian case were more analogous, then the conclusion would be it's not entitled to legislative immunity, because there, there was a, in effect, a zoning-type decision with respect to a particular use of a particular piece of property, which I assume is the distinction that you would be relying on. Absolutely. In San Pedro, you had a loan-type decision being made, and so which one's closer? But I think the type of activity that Mr. Mattis engaged in doesn't come close to those cases. And when you look at what he's doing in terms of circulating flyers, coordinating meetings, responding to his constituents, those are purely legislative in nature. And he didn't do anything else outside that. In fact, what was clear from the videotape of the Tefra hearing that the jury saw, which was the council members trying to keep the audience calm and give everyone an equal opportunity to speak their piece, and as this Court has found, those are the fundamental basics for First Amendment protection, because that's what they should be doing is encouraging open and public debate. And that's what Mr. Mattis did. He should have been granted immunity. He never should have been forced to sit through a month-long trial in Federal Court. He should have been dismissed on the basis of legislative immunity, qualified immunity at least, because how could he know, a newly elected council member, that what he was doing could violate some law? I don't see why qualified immunity is still alive. I mean, isn't that ruling subsumed in the judgment? I'm going back to summary judgment. Well, I know, but on qualified immunity, isn't that ruling, which is a purely interlocutory ruling, subsumed within the judgment in his favor? What difference does it make, put differently? If the Court were to reverse the trial on some instructional error, that would be, we would ask that you don't need to ever go there, because that Judge Wanger's 2001 decision granting summary judgment, he got it right the first time. That should have stayed. So if this Court was inclined to send this back, it wouldn't need to, because had that judgment remained intact, it would have been over then. And that's what should have happened. Okay. Does the Court have any other questions? Thank you. I don't think so. Good morning. My name's Howard Sagaser. I was entrusted with the defense of 11 individuals, who we collectively refer to as the citizen defendants, who were sued simply because they spoke out at a public meeting and organized their opposition to a housing project. During World War II, Norman Rockwell painted the four freedoms, and one of them, it's a picture that's embedded in my mind, is the picture of the person in the town hall speaking out, and that was the freedom of speech, freedom of expression. The greatest generation fought that war to reserve that freedom, among many others. And I think the battleground shifted. Legal warfare was raged upon these citizen defendants for doing nothing more than what Norman Rockwell depicted in that painting. Their conduct was purely political speech, the purest form protected under the First Amendment. And for that, they were subjected to a lawsuit where they were $9 million for troubling $27 million. These were first-time homebuyers. In Fresno, a first-time homebuyer is modest homes, not like the Bay Area here, working-class people. They did not have the resources to engage in that type of legal warfare with developers. And we sought to get them out of this lawsuit early on. We brought a 12b6 motion. And throughout this proceeding, we fought an erroneous legal standard, one being advocated by the plaintiffs, one that the court, for reasons I couldn't quite understand, adopted, saying that the First Amendment did not trump the civil rights or fair housing laws. It's the reverse. Those laws cannot take away that First Amendment right. Ultimately, when this court reaffirmed existing laws, and I have a lot of respect for Judge Wanger. He's a great judge. We just disagreed on this case. I did not see it as new law. I did not see Manistee or White v. Lee as being new law. It reaffirmed existing law. The rights here were well protected, whether you go with Brandenburg in 1969 or the NAACP v. Labor and Hardware in 1982. Those rights are firmly established. And this court need only look at the decision in White v. Lee and at page 1239 where the court said, in an almost identical case, where the government was going after people for speaking out against a housing project, that the law was well established in 1994, that that was protected conduct that those citizens were engaged  If you're – if you were right, where does that end you up? In a remand for reconsideration of the attorney's fees? Yes. Award? Yes. And that's what would be the appropriate disposition is that I think the court – the amount of attorney's fees is at the court's discretion. I think here, we were entitled to attorney's fees. Unfortunately, the court applied the long legal standard, one that we fought to get to a summary judgment, one that, unfortunately, carried over into the attorney's fees because under White v. Lee, these rights were established at least in 94. This lawsuit was filed in 97. And I think that the cases we cited under the California statutes, 1021.5, the County Assembly's Bispo v. the Abalone Alliance and the other cases there clearly show that we're entitled to the fees. And I think the issue here is how much. And so what we're requesting is that you remand it back to the court with instructions to award fees. And then the court applies its discretion. I think we've briefed the issues. Unless the court has any questions, I thank you for your consideration. And I will allow Mr. Berger to sum up for us. Thank you. Thank you. Mr. Berger. Next. Good morning. My name is Bruce Berger. May it please the Court. I represent Travis Compton in this case. Mr. Compton was the 12th individual sued by the plaintiffs for speaking out allegedly against the Wellington Place development.  The totality of the evidence against him was that his name appeared on a set of minutes that innocuously had his name on the first page and that there was deposition testimony by Peter Herzog that Mr. Compton told Mr. Herzog that he was a member of a temporary action committee, which, of course, Mr. Compton denied. So while there may have been an issue of fact as to whether Mr. Compton had membership in a committee, that was, in fact, immaterial because under the Claiborne, Hardware, and Barnes cases, we know that the mere fact of association is not enough. In this case, there was never any evidence that the alleged committees possessed any unlawful goals and clearly there was no evidence that Travis Compton had any specific intent to further an unlawful goal. Absent that evidence, which is, as I understand it, judged according to the strictest law, any claim that Travis Compton was a conspirator was factually frivolous. Now, it's our contention also that the conspiracy claims are also legally frivolous in that, as pointed out by Judge Reinhart in White v. Lee, the law was clearly established as early as 1993, four years before the plaintiffs filed their lawsuit in this matter, that any speech by Mr. Compton, even he had advocated discrimination in housing, which there's no evidence that he ever did that, would have been protected under the First Amendment. Now... Your bottom line request is the same, right? Same as Mr. Sackester's, that's correct. It would be a remand for reconsideration under the proper standard for attorney's fees. That is correct, Your Honor. And lastly, as far as the private attorney general doctrine is concerned, it's our contention that Mr. Compton vindicated First Amendment rights under the City of Fresno v. Press Communications case. That means, as a matter of law, this litigation affects the public interest and the litigation confers a benefit upon the general public, and as in City of Fresno, Travis Compton had little choice but to defend himself, and in doing so, he defended the rights of others whose protected activities are subject to attack by any developer who would seek to squelch legitimate community opposition to their projects. So if Travis Compton is unable to recover attorney's fees and costs in this matter, then as a practical matter, he's simply unable to afford to exercise First Amendment rights, and it would, in effect, be a dead letter. So unless the Court has any questions, I would submit. I don't think so. Thank you. Thank you, Your Honor. Mr. Davis. Thank you, Your Honor. I know I just have a few minutes. The first thing I did want to note is, for the record, we did object to the defense of legitimate non-discriminatory reasons, which, as Mr. Sloan correctly identified, the district judge applied to both treatment and impact analysis. Our objection is at excerpt tab 115731017, mentioned in our opening brief 23, reply brief 27, page 27. It's important here to focus on exactly what the city was doing. They would have you believe that they were choosing, as occurred in San Pedro Hotel, a case I know something about because I litigated that case. The facts of San Pedro Hotel is that there were multiple projects and the city was given the job of allocating federal money. The reason we lost on immunity is because the city was actually choosing among those projects which ones might go forward. We made a subspecies of argument that did not prevail on that issue, but that's what happened there. Here they were voting up and down only on Wellington, so just like the Maui Wedding Chapel case, and unlike San Pedro Hotel. That is also the reason that none of the council members really should have gotten immunity in our judgment. They really didn't qualify for it because it was an administrative decision, up or down. We then were going to go the next day to the California Debt Allocation Committee and the state allocates its debt. The district judge actually seemed to subscribe to the idea that the city could allocate the state's debt by deciding who went in the pool, but that's not really accurate because no matter who was in the pool, if it had been all Fresno projects or no Fresno projects, the state was the one who was going to ultimately make the decision as to whether the financing went forward or not, whether the state's debt was allocated. Moreover, the issue about whether there's... I mean, Mr. Sloan's invitation to vitiate entirely the Fair Housing Act in the TEFRA context, I think is seriously wrong. Also, based on Odekaga, actually, he focuses on the district court opinion, as Your Honor picked up on, but what is actually going on at the circuit level is they apply the ordinary impact pretext analysis and Odekaga's facts were more like San Pedro's to which they were suing the state allocation committee for not allocating them credits, unlike, again, our situation where the city was putting no money into it, nobody in the history of the city had ever been denied a TEFRA, the city wasn't allocating one single farthing of its money, zero on that. In terms of the intent issue, Mr. Sloan claims there was no intent, showing we went over that, but obviously there was very substantial issues on intent. The White v. Lee mancity analysis, which both the city and everyone else tried to claim rights under, the city was not lobbying any other part of government here, so mancity is not applicable. And White was a case involving homeowners who were investigated by HUD for merely speaking out. What they have not revealed to you in an argument, and I think they should have had to, is that we claim that they breached estoppel certificates and induced others to do that, and our clients relied on that before they put up a lot of money to buy this development. What we've got is a lawful activity here that we were engaged in, which was developing low-income housing. My clients did everything right, and they end up with nothing because the city wants to rely on a lot of reasons that we're illegal under federal law, illegal under state law. And even if you take away the entire discussion that we had on my opening remarks about the 65-589.5, you still have the pretext analysis, which is exactly what Odekaga goes through at the 8th Circuit, so that's still there. The problem here is the instruction says you've got to find there's intent before you even apply it, and we did in fact object to that, and because of that and the other instructional errors, the jury was seriously misled and essentially had a verdict directed to them on a school issue. Thank you very much. I'd like to ask you some questions about the suits against the citizens. How much did you sue each one of them for? I believe it was according to proof formally. Where did that $9 million come from? I think we put an approximate value of the loss of development. I think that's what they're picking up on. And is it correct that you could have collected triple damages? We did initially bring a Bain Act claim. The district judge dismissed it, which allowed trebling. But you brought it. We alleged it, yes. You alleged it. Yes. Did you have any basis for it? Yes. What was it? It seemed to me, looking at the record, you had a lot of anonymous complaints. We had a lot of anonymous complaints, and bear in mind also Trial Exhibit 277 that you personally had done. In some instances, we did not have the names of the people who made the specific remarks. In some instances, we did. But you sued individual persons. And did you have proof ready to be produced against them? Yes. And we had representations that they had signed estoppel certificates that they would make. Well, that's a wild stretch, I'll tell you that, that those estoppel certificates had anything to do with what you were doing. That may be a matter of judgment, but that was my reaction. Now, I want to ask you one more. The value of your project at the time it was stopped, you had your damage expert, and he estimated it was worth how much? I believe his number by the time the case went to trial was around $12 or $14 million. But it was $6 million at the time. I think it was closer to $9. And how much had Affordable Housing put into the project? What was its cost at that point? I'm working from memory. My best recollection would have been something around over half a million dollars. Your client put in half a million, and they were ready to realize $6 million, at least. It was a very nice return. Well, the last I heard, developing low-income housing was a lawful purpose. Oh, it is. I would also know, Your Honor, that the earlier issue about the estoppel certificate, we did cite a case in there of Judge Posner on the Seventh Circuit talking about Creek v. Westhaven, and he sent the case to trial on virtually identical facts. I'll take a look at Judge Posner's opinion. It's always interesting. Okay. Anything else? All right. Thank you. The matter just argued will be submitted.
judges: Noonan, Rymer, Gould